IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 17, 2020 Session

## IN RE AMBER R. ET AL.

**Appeal from the Juvenile Court for Carroll County**
**No. 17-JV-7781    Larry J. Logan, Judge**

_____

### No. W2019-01521-COA-R3-PT

_____

In this termination of parental rights case, Appellant/Mother appeals the trial court's termination of her parental rights to the minor children on the grounds of: (1) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii); (2) substantial noncompliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); (3) persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3); and (4) mental incompetence, Tenn. Code Ann. § 36-1-113(g)(8). Appellant also appeals the trial court's finding that termination of her parental rights is in the children's best interests. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jasmine McMackins Hatcher, McKenzie, Tennessee, for the appellant, Latoya R.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Stephanie J. Hale, Trenton, Tennessee, guardian ad litem.[2]

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

[2] The guardian ad litem ("GAL") submitted a brief adopting in full Appellee's brief and agreeing with Appellee's argument on appeal regarding termination of Mother's parental rights. At oral argument, the GAL stated that the Children are doing well in a pre-adoptive home, and the GAL believed it was in the Children's best interests to terminate Mother's parental rights.

## OPINION

## I. Background

Appellant Latoya R. ("Mother") is the biological Mother of Amber R. (d/o/b July 2011), Ashley Z. (d/o/b December 2013), and Andrew Z. (d/o/b October 2015) (together, the "Children").[3] This family has had a lengthy history with Appellee Tennessee Department of Children's Services ("DCS"). As it concerns this appeal, DCS became involved with this family on January 5, 2017, when Mother, and her then-boyfriend, Eric F., reported to the Bruceton Police Department that the couple and the Children were homeless. Prior to becoming homeless, it was reported that Mother, Mr. F., and the Children lived with strangers, family, or in hotels. DCS contacted the family the day they reported to the police station. According to a DCS caseworker, the Children were appropriately dressed for the cold but had not bathed recently and had an odor. While DCS offered to help Mother apply for housing, Mother refused, explaining that she and her boyfriend were going to stay in a motel. Nevertheless, that night, DCS took the family to the store and purchased groceries, baby wipes, and hygiene products. DCS also offered to redeem Mother's Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") voucher, but she declined. On January 9, 2017, Mother contacted DCS stating that she ran out of food the night before. While Mother had some canned goods, she did not have a can opener, bowls, or silverware. Mother also informed DCS that she lost her WIC voucher. DCS again purchased groceries and took them to the family. On January 10, 2017, Mother contacted DCS stating that she would soon be out of diapers for Andrew; DCS took Mother diapers. While Mother consistently reported that she was out of food and other essential items, DCS caseworkers observed that the family had non-essential items, such as cigarettes.

On January 13, 2017, DCS filed a petition to transfer temporary legal custody from Mother to DCS in the Juvenile Court of Carroll County, Tennessee ("trial court"). The petition also asked the trial court to declare the Children dependent and neglected. On January 31, 2017, the trial court appointed a GAL for the Children. During this time, Mother was also appointed counsel. On March 7, 2017, the trial court found probable cause that the Children were dependent and neglected "due to [Mother's] failure to work with services to address her issues of instability . . . ," and it granted DCS temporary legal custody of the Children. The Children were placed in DCS custody the same day. On April 4, 2017, Mother waived the adjudicatory hearing, and the trial court found clear and convincing evidence that the Children were dependent and neglected.

---

[3] The record shows that Mother was married to Joseph R., Amber's biological father. During the marriage, Mother gave birth to Ashley and Andrew, though no father was listed on either child's birth certificate. However, Mother named Jeffrey P. as the biological father of both Ashley and Andrew. During this case, the trial court terminated both fathers' parental rights to their respective children, and neither father appealed the termination. Therefore, the fathers are not parties to this proceeding.

On March 14, 2017, Mother underwent a psychological evaluation with Will Beyer, a licensed senior psychological examiner. The evaluation revealed that Mother was emotionally unstable and unable to make rational decisions concerning the well-being of the Children due to her intellectual disability and mood disorders. The evaluation further found that Mother frequently depended on others for her own basic needs. Based, in large part, on Mother's evaluation, on April 4, 2017, DCS created the first of four permanency plans for the family. Mother and her attorney participated in the plan's creation, and Mother signed it. The plan, which the trial court ratified on May 2, 2017, required Mother to: (1) provide a safe and stable home environment and provide for the Children's basic needs; (2) apply at the Housing Authority in Benton and/or Carroll counties or other rental communities; (3) follow Mr. Beyer's recommendations from the psychological evaluation; (4) complete mental health intake forms at local mental health facilities and follow recommendations; (5) participate in counseling and psychiatric services; (6) complete parenting and budgeting classes and follow recommendations (could be completed via in-home services); (7) participate in counseling, which includes education on social skills, interpersonal boundaries, and parenting; (8) avoid relationships that pose a risk to her well-being or that of the Children; and (9) complete anger management (could be completed via in-home services). Thereafter, the plan was amended three times, although the amended plans' requirements for Mother are substantively the same as the responsibilities in the initial plan.[4]

DCS provided Mother with services for well over one year, discussed *infra*, without Mother making much progress on the permanency plans. Importantly, Mother failed to establish a safe and stable home environment for the Children. Rather, Mother continued to drift between the homes of family, friends, and acquaintances in three different cities. Accordingly, on July 19, 2018, DCS filed a petition to terminate Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with permanency plan; (3) persistence of conditions; and (4) mental incompetence. DCS also alleged that termination of Mother's parental rights was in the Children's best interests.

The trial court heard DCS' petition on February 22, 2019, and the following witnesses testified: (1) Mr. Beyer, a licensed senior psychological examiner who conducted Mother's psychological evaluations; (2) Courtney Affolter, Mother's first DCS caseworker; (3) Kelly Fries, Mother's final in-home services counselor; (4) Laura Tony, Amber's counselor; (5) Mother; (6) Haley Kalinowski, Mother's second DCS caseworker; (7) Desiree M., the Children's foster mother at the time of trial; and (8) Ralph Z., Mother's father. DCS entered thirty exhibits into evidence, including: (1) Mr. Beyer's psychological evaluations of Mother; (2) documents from the underlying dependency and neglect case;

---

[4] The trial court ratified each permanency plan. Additionally, it found that the goals of each plan were appropriate, that the responsibilities were reasonably related to achieving said goals, and that the goals were in the best interest of the Children.

and (3) all four permanency plans and the trial court's orders ratifying same.

By order of May 2, 2019, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with permanency plan; (3) persistence of conditions; and (4) mental incompetence. The trial court also found that termination of Mother's parental rights was in the Children's best interests. On May 24, 2019, Mother filed a motion to amend judgment and to stay execution of judgment, which the trial court denied on July 30, 2019. Mother appeals.

## II. Issues[5]

We state the dispositive issues as follows:

1.   Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate Appellant's parental rights.

2.   Whether termination of Appellant's parental rights is in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee

---

[5] We note that DCS raised in its brief the issue of "[w]hether the Court should consider the post-judgment documents in the record." The only facts this Court may consider on appeal are those "established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14." Tenn. R. App. P. 13(c). Tennessee Rule of Appellate Procedure 14 provides that a party may file a motion asking this Court to consider post-judgment facts. *See* Tenn. R. App. P. 14(a). Additionally, Rule 14 allows this Court the discretion to "consider facts concerning the action that occurred after judgment." *See* Tenn. R. App. P. 14(a). Here, neither party filed a motion under Rule 14, and we decline to exercise our discretion in this case. Accordingly, we have limited our review of the record to the facts established as evidence in the trial court.

- 4 -

law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

***In re Carrington H.***, 483 S.W.3d at 524.  With the foregoing in mind, we turn to analyze the grounds under which the trial court terminated Mother's parental rights.

## IV. Grounds for Termination

### A.  Abandonment by Failure to Provide a Suitable Home

The trial court found, by clear and convincing evidence, that Mother abandoned the Children when she failed to provide a suitable home.  Tennessee Code Annotated section 36-1-113(g)(1) authorizes termination of parental rights on the ground of abandonment as defined by Tennessee Code Annotated section 36-1-102(1)(A)(ii) when:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102 (1)(A)(ii).  Concerning the first element, it is undisputed that the Children were removed from Mother's care by court order on March 7, 2017. Concerning the second element, in its order terminating Mother's parental rights, the trial court found that DCS made reasonable efforts to prevent the Children's removal from Mother.  *See* Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(b).  We agree.  As discussed, *supra*, when DCS learned that Mother and the Children were homeless, DCS tried to help Mother

obtain housing, but she refused help. Despite Mother's refusal, DCS still provided the family with groceries and hygiene products on multiple occasions. Accordingly, we agree that DCS made reasonable efforts to prevent removal of the Children from Mother's care. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(b).

We now turn to the final element, whether DCS made reasonable efforts to assist Mother in establishing a suitable home for a period of four months following the Children's removal, and whether Mother made reciprocal efforts to establish same. As an initial matter, we note that DCS' efforts to assist a parent "shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal . . . ." Tenn. Code. Ann. § 36-1-102(1)(A)(ii)(c). Additionally, "[a] suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). It requires "[a]ppropriate care and attention . . . to the child[ren]." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). Further, "a parent's compliance with counseling requirements is 'directly related to the establishment of a suitable home.'" *Id.* (citing *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)). Indeed, "the problems and conditions for which the various . . . counseling efforts were conducted address matters[,] which make the home environment suitable for raising children . . . ." *In re M.F.O.*, 2009 WL 1456319, at *5. With this understanding, we turn to the record.

On March 14, 2017, immediately following the Children's removal, DCS arranged for Mother to participate in a psychological evaluation with Mr. Beyer, discussed *infra*, the purpose of which was to discern Mother's mental health status "and her ability to provide an adequate, safe[,] and stable home environment for her [C]hildren." On April 4, 2017, using Mother's results from the evaluation, DCS worked with Mother to create the first permanency plan, which stated the permanency goal for the Children as "return to parent/placement with kin/relative." The initial plan, discussed *infra*, provided that DCS would transport Mother to local housing authorities or other potential rental communities and would assist her with any fees associated with moving into a new home, such as deposits and utilities. The plan also outlined that, at Mr. Beyer's recommendation, DCS would refer Mother to counseling and psychiatric services. Finally, the plan stated that DCS would also refer Mother to in-home service providers who would work with Mother to complete parenting classes and anger management.

In its final order, the trial court found that DCS caseworkers: (1) "encouraged Mother to apply for public housing and explained the benefits available" to her; (2) "prepped [Mother] for her applications for rentals;" and (3) transported Mother to apply for non-public housing after Mother rejected public housing. The trial court also found that DCS provided Mother with in-home services "in an attempt to teach her to function in daily life." Indeed, the record shows that DCS continually worked with Mother, during,

and beyond, the four-months following the Children's removal.[6] Throughout the pendency of this case, two DCS caseworkers supported Mother, Ms. Affolter (from March 2017 through September 2018) and Ms. Kalinowski (from September 2018 through trial), both of whom testified at trial that they tried to help Mother obtain public and non-public housing. Despite DCS' efforts, on appeal, Mother effectively argues that it was wrong for DCS to encourage Mother to apply for affordable public housing because "DCS knew it was going to be difficult for Mother to secure public housing because she could not locate a copy of her birth certificate, state identification, or [s]ocial [s]ecurity [c]ard." However, Mother fails to recognize that DCS tried to help her procure these documents. Indeed, Ms. Affolter testified that she attempted to apply for a birth certificate on Mother's behalf, but was not allowed. Thereafter, she reminded Mother on many occasions to look for her birth certificate or apply for a new one, but Mother would make excuses to not follow through. Similarly, Ms. Kalinowski testified that she scheduled three to four appointments with Mother to transport her to acquire a new social security card, but Mother cancelled for various reasons. The fact that Mother could not locate her birth certificate or social security card did not preclude her from applying for public housing. Rather, Mother's own inactions, despite DCS' efforts, prevented her from securing public housing.[7]

In addition to trying to help Mother find stable housing, DCS also made efforts to help Mother establish a suitable home environment for the Children. In March 2017, DCS referred Mother to in-home counseling services, which she received through December

---

[6] On appeal, Mother argues that the trial court "did not focus its attention on the relevant four-month period of time [from March 7, 2017 to July 7, 2017]," but rather "assessed the entirety of the case, finding that Mother moved multiple times since the [C]hildren were removed and finding that all services DCS offered to Mother since the removal relevant to the analysis." Mother argues that such a "broad assessment is not proper for this ground." As an initial matter, Mother fails to provide any law to support her argument. Further, we have explained that Tennessee Code Annotated section 36-1-102(1)(A)(ii) "does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal." *In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *12 n.8 (Tenn. Ct. App. Dec. 2, 2009) (citing *In re J.C.W.*, No. M2007-02433-COA-R3-PT, 2008 WL 4414675, at *4-6 (Tenn. Ct. App. Sept. 26, 2008) (no perm. app. filed) (examining both the four-month period following removal and the four-month period preceding the filing of DCS' termination petition)); *see also In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016). Rather, DCS is required to make "'reasonable efforts' *for a four-month period* following the removal of the children." *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020) (emphasis added); *see also In re Brian W.*, No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at *6 (Tenn. Ct. App. Oct. 30, 2020). Here, DCS made reasonable efforts to assist Mother well beyond the required four-month period, giving her more time to demonstrate that she could establish a suitable home. Accordingly, the trial court did not err when it considered the entirety of the case.

[7] We note that, on appeal, Mother also blames DCS for her instability and homelessness, stating that "Mother had stable housing with her parents, but DCS insisted that she find her own home." As discussed, *infra*, Mother's relationship with her family is one of instability and volatility. The record demonstrates that Mother frequently moved in and out of her parents' home, and Mother herself expressed that she did not want to live with her family due to the tumultuous relationship. Further, for reasons discussed, *infra*, Mother's parents' house was unsuitable for the Children.

2018. The goal of these services was to give Mother the tools to create a suitable home for the Children. Specifically, the providers addressed Mother's issues related to parenting, budgeting, housing, cleanliness, coping skills, anger management skills, and appropriate relationships and boundaries. Unfortunately, the record demonstrates that Mother was inconsistent with her in-home counseling services, and she often cancelled appointments with providers. At trial, Ms. Fries, Mother's final in-home counselor, testified that Mother failed to make progress because she cancelled so many appointments. As a result, Ms. Fries discontinued services with Mother in December 2018.

Likewise, in May 2017, after Mother's initial psychological evaluation, DCS referred her to Carey Counseling for mental health counseling, medication management, and other services. Mother began therapy in October 2017. Unfortunately, the record shows that Mother was inconsistent with her treatment. Mother's caseworkers testified that they offered to drive Mother to her therapy appointments, but she often refused help.[8] As a result, she missed several of these appointments, because she either forgot about them or could not arrange for transportation. The record also shows that, because Mother frequently moved cities, she often changed mental health providers, which led to a lapse in her treatment. Indeed, Mother failed to attend counseling appointments and to take her prescription medications from March 2018 through June 2018.

In light of the foregoing, the trial court found that DCS "made numerous reasonable efforts to assist Mother [in] provid[ing] a suitable home . . ." for the Children. Indeed, we agree that DCS provided Mother with comprehensive, holistic services to help her find adequate housing and to create a suitable home environment for the Children. Notably, Ms. Affolter testified that she did not believe there were any other services available that DCS could have provided to Mother.[9] Nevertheless, despite all these services, it is clear from the record that Mother failed to make reciprocal efforts toward procuring a safe and stable environment to which the Children could return. The trial court found, by clear and convincing evidence, that,

> during the two-year period[] that Mother has not had [t]he Children[,] she has not established a suitable home which would be safe and stable for the Children. She has made very little effort to do so. The efforts of [DCS] far exceed any reasonable efforts by Mother, and, based upon the actions of Mother, she has abandoned her rights to the Children. It is very unlikely that Mother will be able to provide a suitable home for the Children at an early date, if ever.

---

[8] Mother does not drive and has never had a driver's license.
[9] Despite all the services mentioned above, Mother argues on appeal that DCS failed to provide her with targeted mental health treatment to address her intellectual disability and mood disorders. However, the record reflects that, prior to trial, Mother believed the services she received were helping her.

- 9 -

We agree. "'Parents desiring the return of their children must . . . make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from custody.'" *In re Kambri P.*, No. M2019-01352-COA-R3-PT, 2020 WL 2991793, at *5 (Tenn. Ct. App. June 4, 2020) (quoting *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sept. 19, 2014)). We conclude that Mother failed to make such reasonable and appropriate efforts, and that DCS' efforts to assist her in establishing a suitable home exceeded Mother's own efforts to accomplish the same. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). Though DCS provided Mother with services to address her homelessness, mental health issues, issues with cleanliness, and trouble managing money, the record shows that Mother either refused these services or did not use them consistently. *See In re M.F.O.*, 2009 WL 1456319, at *5 ("The failure of [m]other and [f]ather to cooperate with DCS and to comply with the requirements of the various counseling services was directly related to the establishment and maintenance of a suitable home."). Mother's limited efforts to find suitable housing and her failure to consistently comply with her mental health treatment and in-home counseling services, demonstrates her lack of concern for the Children and her inability to provide a suitable home environment. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c); *see In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018) *perm. app. denied* (Tenn. July 12, 2018) ("Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the [c]hildren and resulted in her inability to provide a suitable home environment."). Given the foregoing, we agree with the trial court that it appears unlikely that Mother will be able to provide a suitable home for the Children at an early date, if ever. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). Accordingly, we affirm the trial court's finding, by clear and convincing evidence, that Mother abandoned the Children by failure to provide a suitable home.

### B. Substantial Noncompliance with Permanency Plan

The trial court also found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of substantial noncompliance with the requirements of the permanency plans. Tennessee Code Annotated section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). When addressing this ground, "[o]ur concern is with the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020).

As discussed by this Court in *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *4 (Tenn. Ct. App. Nov. 28, 2006):

To prevail in a termination case on a claim of substantial noncompliance with a permanency plan, DCS must prove: (1) the terms of the plan, ***Dep't of Children's Services v. D.W.J.***, No. E2004-02586-COA-R3-PT, 2005 WL 1528367 (Tenn. Ct. App. E.S., June 29, 2005); (2) that the plan requirements were reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, ***In re Valentine***, 79 S.W.3d at 547; ***In re L.J.C.***, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003); and (3) that the parent's noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. ***Valentine***, 79 S.W.3d at 548-49; ***In re Z.J.S.***, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct.App. M.S., June 3, 2003); ***Dep't of Children's Services v. T.M.B.K.***, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006).

***In re A.J.R.***, 2006 WL 3421284, at *4.

In its order terminating Mother's parental rights, the trial court found that

. . . although there were many actions required to be taken, the basic goals for the Children to return home were that Mother provide a safe, stable home provided with utilities and food necessary for a reasonable life, free of negative influences such as drugs.[10]

***

The majority of Mother's responsibilities, in addition to obtaining safe and stable housing for her and the Children, required Mother to obtain mental counseling and anger management. Mother was given certain dates to complete her statement of responsibilities. Mother was either unwilling or unable to complete the responsibilities required of her to regain custody of the Children.

The trial court's order concerning Mother's substantial noncompliance with the permanency plans is deficient. As an initial matter, the trial court failed to find that the requirements of the plans were "reasonable and related to remedying the conditions which necessitate[d] foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). The Tennessee Supreme Court has held "that this finding must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2)." ***In re Valentine***, 79 S.W.3d at 547. Because the trial court failed to make findings concerning the

---

[10] We note that, under the section of its order titled "Substantial noncompliance with permanency plan," the trial court curiously began making findings concerning the persistence of conditions ground, discussed *infra*. We omit that portion of the trial court's order here.

reasonableness of Mother's responsibilities under the permanency plans, we review this issue *de novo*. ***Id.***

"Conditions necessitating foster care placement may include conditions related both to the child[ren]'s removal and to family reunification." ***Id.*** As stated in the initial permanency plan, the Children were removed from Mother's custody due to environmental neglect stemming from Mother's instability and inability to provide for the Children's basic needs. Specifically, as discussed, *supra*, in January 2017, Mother and her then-boyfriend reported to the police that the couple, along with the Children, were homeless. Prior to becoming homeless, it was reported that Mother, her boyfriend, and the Children lived with strangers, family, or in hotels. Soon after the Children entered DCS custody, it became apparent that Mother's mental health struggles hindered her ability to establish safe and stable interpersonal relationships, to keep a clean house, and to budget her money, all of which also prevented Mother from regaining custody of the Children. As discussed *supra*, Mother's requirements under the permanency plans were to: (1) provide a safe and stable home environment and provide for the Children's basic needs; (2) apply at the Housing Authority in Benton and/or Carroll counties or other rental communities; (3) follow Mr. Beyer's recommendations from the psychological evaluation; (4) complete mental health intake forms at local mental health facilities and follow recommendations; (5) participate in counseling and psychiatric services; (6) complete parenting and budgeting classes and follow recommendations (could be completed via in-home services); (7) participate in counseling, which includes education on social skills, interpersonal boundaries, and parenting; (8) avoid relationships that pose a risk to her well-being or that of the Children; and (9) complete anger management (could be completed via in-home services). Considering Mother's issues with homelessness, her mental health struggles, and her failure to provide the Children with a suitable home environment, we conclude that the above requirements were reasonable and related to remedying the conditions that necessitated foster care placement in this case. Tenn. Code Ann. § 37-2-403(a)(2)(C). Accordingly, we turn to the question of whether Mother was substantially noncompliant with her responsibilities under the permanency plans.

Regrettably, the trial court's order concerning Mother's substantial noncompliance provides no specific factual findings and only generally states that "Mother was either unwilling or unable to complete the responsibilities required of her to regain custody of the Children." However, when considering the trial court's entire order, and upon our *de novo* review of the record, we conclude that Mother was substantially noncompliant with her responsibilities under the permanency plans.

The Tennessee Supreme Court has explained that

[s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial.

- 12 -

> Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d at 548. We acknowledge that Mother completed some of the permanency plan requirements. She participated in Mr. Beyer's evaluations and in some mental health counseling, she sporadically engaged the services of her in-home counselors, she briefly obtained independent housing, and she attended parenting classes. Clearly, Mother made some effort.

However, as we have explained before, "permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed, *supra*, the record demonstrates that Mother failed to put forth a real effort to complete her responsibilities under the permanency plans in a meaningful way. *Id.* Arguably, Mother's two most important responsibilities under the plans were to obtain safe and stable housing and to consistently participate in her mental health treatment. Complying with these responsibilities may have likely placed Mother in the position to provide the Children "with a safe, stable home and consistent appropriate care." *Id.* Unfortunately, Mother was substantially noncompliant with both. Though she had assistance from DCS, Mother failed to follow through with applying for public housing. While Mother obtained non-public housing, the record shows that she did not remain in these homes for long. During the pendency of this case, Mother bounced between her friends' and families' houses, never obtaining safe, stable housing for an extended period of time. At the time of trial, Mother was still without same. Additionally, while Mother occasionally participated in mental health counseling, she often cancelled or failed to show up to her appointments, and the record shows that Mother went months without mental health treatment and medications. Similarly, though Mother sporadically participated in in-home counseling services, as discussed, *supra*, Ms. Fries discontinued services with Mother because Mother cancelled so many appointments that she failed to make any real progress. Finally, also of great concern, the record shows that, discussed, *infra*, Mother continued to seek relationships with men who posed a risk to her well-being and to that of

- 13 -

the Children.

"Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537. Here, it appears Mother was simply "going through the motions." "Mother could have used this opportunity to address her most serious problems. . . ." *In re C.S., Jr., et al.*, 2006 WL 2644371, at \*10. She could have used DCS as a resource to help her obtain safe and stable, affordable housing. She could have consistently participated in her mental health treatment and in-home counseling services to help her make healthy decisions, to learn how to manage her daily life, and to provide a suitable home environment for the Children. Instead, Mother made inconsistent, superficial efforts that "fell far short of reaching the overall goal of the permanency plans, which was for Mother to demonstrate that she had changed her conditions so that she could take full responsibility for raising her [three] children in a healthy, safe, stable home." *Id.* Accordingly, we conclude that the evidence clearly and convincingly supports the trial court's finding and conclusion that Mother was substantially noncompliant with the permanency plans.

### C. Persistence of Conditions

The trial court also found that termination of Mother's parental rights was appropriate under Tennessee Code Annotated section 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). The persistence of conditions ground focuses "on the *results* of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874 (emphasis added). The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *See In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008) ("The purpose behind the [persistence of conditions] ground is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.")). Thus, the question before the court is whether it is likely "that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care with weekly visits with the [parent]." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at \*5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions that must be shown to terminate parental rights, to-wit:

The child has been removed from the home or the physical or legal custody

- 14 -

of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child,[11] and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. As noted above, the Children were removed from Mother's custody on March 7, 2017, and the trial court heard the petition for termination on February 22, 2019, over twenty-one months after the Children's removal.

Before analyzing the remaining elements, we find it pertinent to first address Mother's arguments concerning this ground on appeal. Mother does not appear to dispute that the conditions, which led to the Children's removal persist. Rather, she argues that "[t]he main reason this ground should be dismissed is due to DCS' contribution to Mother's persistent conditions." Specifically, Mother argues that DCS required her to "undergo a task beyond her ability—i.e. living alone." Mother further argues that DCS "facilitated [her] ongoing instability by [not] allow[ing] her to remain with her parents" and by failing to "offer family services to remedy any conflict in [Mother's] family." However, the record shows that DCS did not require Mother to live alone or without support. Rather, as evidenced by the December 14, 2017 permanency plan, Mother's providers were tasked with working with her to identify and develop positive support persons who could help care for the Children. Mother's caseworkers likewise testified that DCS did not require Mother to live alone; instead, they encouraged her to find appropriate support. However, DCS informed Mother that her parents' home environment and history with Child Protective Services prevented the Children's placement there.

---

[11] "The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B).

- 15 -

Indeed, the record shows that Mother's parents' home would not have been suitable for the Children. Mother's parents' house contained only two-bedrooms: Mother's parents occupied one room, and the other room was described as "similar to a storage room." Mother testified that she slept in either a recliner or on a "bed cot" when she stayed with her parents. There was hardly room for Mother and her parents in the house, let alone three children. Furthermore, Ms. Affolter testified that Mother's family was very resistant to working with DCS, and they refused to allow DCS providers in their home. Accordingly, DCS did not find Mother's parents' house to be an appropriate home for the Children. We also note, while Mother's father testified at trial that Mother and the Children could stay at his house, at the time of trial, several other people were living in the home, as well as fourteen dogs. This further supports that the home would not have been a suitable placement for the Children.

Finally, we note that Mother's relationship with her family is one of instability and volatility. While Mother moved in with her parents frequently, she left their home just as often. Mother herself reported to her caseworkers that she did not want to live with her family because of the tumultuous relationship. While Mother argues on appeal that DCS should have offered Mother and her family services to remedy this conflict, it is important to recognize that "proof of [DCS'] reasonable efforts is not a precondition to termination of parental rights." *In re Kambri P.*, 2020 WL 2991793, at *10 (citing *In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015)). Accordingly, DCS' omission in providing Mother and her family counseling services has no bearing on whether DCS met its burden as to Mother's persistence of conditions. Having addressed Mother's arguments, we turn to the remaining elements of this ground.

In its order, the trial court found that: (1) the Children had been removed from Mother's custody for more than six months; (2) "[t]he conditions that led to the removal still persist, preventing the Children's safe return to [Mother];" (3) "[t]here is little likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to Mother;" and (4) "[t]he continuation of the parent and child relationship greatly diminishes the [Children's] chances of early integration into a safe, stable, and permanent home." The trial court further found that

[a]ll three [C]hildren are in [a] foster home[] and living safe and stable lives. Although the [C]hildren love their mother, they do not want to return to her care. One of the Children now does not wish to visit [] Mother or talk on the telephone [with Mother]. [Mr.] Beyer also opined "after almost a year of supportive services she does not at this point appear to have established independent living nor does she appear to be capable of mature and rational decision-making required to provide for the day-to-day care of her children she still does not have a residence, furnishings, adequate income or a support system other than DCS upon which she can rely. She is not managing her limited income well. She continues to change residences frequently."

- 16 -

The record supports these findings. As discussed, *supra*, the Children were removed from Mother's care due to environmental neglect stemming from Mother's instability and inability to provide for the Children's basic needs. While DCS' initial concern was Mother's lack of housing, shortly after the Children entered DCS custody, it became clear that Mother's mental health issues, discussed *infra*, also prevented her from establishing a suitable home environment for the Children. Notably, Mother struggled to understand how to: (1) establish safe and stable interpersonal relationships; (2) keep a clean house; and (3) budget her money.

Turning to the record, as discussed, *supra*, it is clear that Mother's housing remains unstable. Since the Children entered DCS custody in 2017, Mother has moved over ten times, rarely staying in one location for an extended period of time. While DCS attempted to help Mother secure affordable public housing, Mother insisted on finding other living arrangements on her own, resulting in her frequent moves. At trial, Mother testified that she currently resides in a two-bedroom trailer owned by David H. and located on Mr. H.'s father's land. Concerningly, Mother met Mr. H. in August 2018 when he saw Mother walking in town, asked if she needed a ride, and she accepted. Without knowing Mr. H. for more than one month, Mother moved into his trailer at the end of August 2018. At trial, Mother insisted that Mr. H. was simply a "really, really close friend," not a boyfriend. However, Mother later admitted that she miscarried Mr. H.'s child in November 2018.

Mother's immediate trust and reliance on Mr. H. demonstrates her dangerous pattern of engaging in romantic relationships with men she barely knows and relying on them for support. At trial, Mother acknowledged that she has chosen men in the past who were inappropriate for her Children to be around.[12] Ms. Affolter testified that she cautioned Mother regarding the people with whom she associates, particularly the men with which she develops relationships. Ms. Affolter stressed to Mother that the people in Mother's life, not only affect Mother's safety, but the safety of her Children and their ability to return to her. Despite these conversations, Mother has continued to pursue relationships with men she does not know and has relied on them for support, as exemplified by her reliance on Mr. H. for her current home. Mother's actions clearly demonstrate that she remains unable to choose appropriate sources of support not only for herself, but for the Children as well.

---

[12] For example, Mother testified that, soon after the Children were taken into DCS custody, she met John S. who moved in with her one month later. Mother testified that Mr. S. lived with Mother for one month, but she forced him to leave after he threatened her with a knife. One or two months later, Mother was told that Mr. S. was accused of touching her niece in a sexually inappropriate manner, though Mother seemed to doubt the truthfulness of this accusation in her testimony. The evidence also demonstrates that, after Mother and Mr. S. broke up, Mother met a man named Damien/James (according to the record, this man goes by both "Damien" and "James."). After Mother disclosed her relationship with this man to Ms. Affolter, Ms. Affolter informed Mother that he was on the sex offender registry. When Mother learned of this, she told Ms. Affolter that Damien/James was not her boyfriend, just her friend, and Mother continued to lean on him for support.

The record also shows that Mother continues to struggle with establishing a suitable environment for the Children. The cleanliness of Mother's home has been a persistent issue throughout this case. When she began working with Mother, Ms. Affolter identified Mother's pets as the cause of Mother's uncleanliness. At trial, Ms. Affolter testified that Mother's pets used the bathroom inside the house, and Mother failed to clean it up appropriately. As a result, Ms. Affolter had multiple conversations with Mother about the importance of cleanliness, especially when little children would be in the home. Nevertheless, this issue has persisted. At the time of trial, Mother had three dogs and one outside cat living with her. Both Ms. Kalinowski and Ms. Fries, who provided Mother services after Ms. Affolter, testified that the cleanliness of Mother's home had not improved. Specifically, Ms. Kalinowski testified that, when she visited Mother's home in December 2018, the home smelled strongly of urine, and she believed she sat in urine on the couch during her visit.

In addition to her inability to provide a clean home, Mother also remains unable to budget her money. The record shows that Mother's providers consistently worked with Mother concerning this issue. Nevertheless, at trial, Ms. Affolter testified that Mother frequently ran out of money by the second or third week of the month. Mother's trial testimony confirmed that this issue persists. Mother testified that she is on a limited income of $810 per month from social security and food stamps. Her monthly expenses for electricity and food (she does not pay rent) total around $350. Notwithstanding a surplus of about $460 each month, at the time of trial, on February 22, 2019, Mother had no money in savings, and she had run out of money until her next check on March 1, 2019.

There is clear and convincing evidence that the conditions, which led to the Children's removal persist. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Additionally, it is unlikely that Mother's instability and inability to provide for herself or the Children will be remedied at an early date so the Children could be returned to Mother in the near future. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). At the time of trial, Mother had been working with DCS and service providers for nearly two years to remedy the conditions that led to the Children's removal. Nevertheless, Mother continues to: (1) lack stable and appropriate housing; (2) choose unsafe and inappropriate relationships with men; (3) live in an unclean environment; and (4) mismanage her monthly income. "Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re A.R.*, 2008 WL 4613576, at *20 (citing *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). While it is possible that Mother's intellectual disability or mental disorders, discussed *infra*, may prevent her from providing an appropriate environment for the Children, it does not excuse her. Indeed, we have explained before that "[a] parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some

- 18 -

other cause, constitutes a condition which prevents the safe return of the child to the parent's care." ***In re A.R.***, 2008 WL 4613576, at \*20 (citing ***In re T.S.***, 2000 WL 964775, at \*7). Finally, there is no guarantee that Mother will ever be able to provide a safe and stable environment for the Children, "and the time spent waiting for this to occur greatly diminishes [the Children's] chances of early integration into a safe, stable and permanent home." ***In re A.R.***, 2008 WL 4613576, at \*20 (citing ***In re T.S.***, 2000 WL 964775, at \*7); *see also* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii); ***In re D.C.C.***, 2008 WL 588535, at \*9. Accordingly, we conclude that there is clear and convincing evidence that DCS met its burden as to the persistence of conditions ground.

### D.  Mentally Incompetent to Provide Care and Supervision of the Children

Lastly, the trial court found, by clear and convincing evidence, that Mother does not possess the mental competence required to properly care for the Children. Tennessee Code Annotated section 36-1-113(g)(8) provides:

(8)(A) . . . [J]uvenile courts shall have jurisdiction . . . to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child.

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8). "For this ground, it is insufficient to show only that a parent suffers from mental incompetence; rather, 'the real issue is whether this impairment adversely affects [the] ability to parent[.]'" ***In re Katrina S.***, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at \*10 (Tenn. Ct. App. Sept. 3, 2020) (quoting ***In re C.C.***, No.

- 19 -

E2016-00475-COA-R3-PT, 2016 WL 5266669, at *13 (Tenn. Ct. App. Sept. 22, 2016)); *see also* **In re Quadayvon H.**, No. E2016-00445-COA-R3-PT, 2016 WL 7340427, at *8 (Tenn. Ct. App. Sept. 30, 2016) ("The issue in this case is not whether Father has impaired cognitive functioning. Rather, the issue is whether his impairment adversely affects his ability to parent his children.").

In its order, the trial court found:

> Mother is mentally incompetent to provide for the future care and supervision of the Children. The evidence shows, by clear and convincing evidence, that [M]other is incompetent to adequately provide for the care and supervision of the Children because her mental condition is presently so impaired and so likely to remain so that [it] is unlikely that [Mother] will be able to assume or [resume] . . . the care of and responsibility [for] the Children in the near future.

> The psychological evaluation performed on Mother by Will Beyer . . . and the updated evaluation . . . indicate that Mother suffers from severe depressive disorder and weak verbal abilities. Mother is very low functioning and has difficulty making decisions with the Children. Will Beyer reached the same conclusions from both tests, 12 months apart. During the 12 months between the two evaluations, Mother moved seven times. It is the opinion of Will Beyer that, after almost a year of supportive services she does not at this point appear to be capable of mature and rational decision-making required to provide for the day-to-day care of her children. She still does not have a residence, furnishings, adequate income or a support system other than DCS upon which she can rely. She is not managing her limited income well. She continues to change residences frequently.

> Based upon the totality of the circumstances and the facts found as true and correct by the [c]ourt, unfortunately, Mother cannot provide a stable home or a stable environment for her Children and may never be able to do so. . . .

As the trial court found, it based its conclusion concerning Mother's mental incompetence on the testimony and reports of DCS' witness, Mr. Beyer, a licensed senior psychological examiner and a licensed professional counselor. Mr. Beyer conducted the first psychological evaluation of Mother on March 14, 2017 and a follow-up evaluation on March 14, 2018. Based on diagnostic testing and two interviews with Mother, Mr. Beyer diagnosed her with borderline intellectual functioning, disruptive mood dysregulation disorder, adjustment disorder, and major depression. Concerning Mother's intellectual disability, Mr. Beyer testified that her verbal comprehension test scores of 63 (from the

initial evaluation) and 68 (from the follow-up) were concerning.[13] He explained that Mother's scores placed her in the bottom 1-2% of individuals regarding verbal comprehension skills. Verbal comprehension affects a person's general mental abilities and their academic learning abilities, as well as their ability to problem solve, use good judgment, and learn from their experiences. Importantly, Mr. Beyer testified that Mother's intellectual disability could affect her ability to care for the Children because individuals within Mother's range of scores often have difficulty providing for their day-to-day needs, are unable to make decisions (including financial decisions), have difficulty obtaining and maintaining employment, have difficulty maintaining a budget, and may have difficulty following directions. As a result, they often "require a lot of support from other individuals." Mr. Beyer also testified that people with lower verbal comprehension scores are often manipulated by others resulting in trust issues, which can create conflict in relationships and impede an individual's ability to identify appropriate relationships.

Mother's intellectual disability also causes her to misperceive information as she is unable to process or understand it. Unfortunately, when compounded with Mother's mood disorders, such misperception often causes Mother to become reactive, upset, and angry. Ms. Affolter testified that Mother could be very impulsive and would react very quickly and angrily to certain situations. When Ms. Affolter would try to explain to Mother that Mother misunderstood some issue, Mother was often uninterested in an explanation because she was too upset by the situation. Ms. Affolter's testimony is substantiated by Ms. Fries' testimony that Mother became angry and resentful after Ms. Fries discussed the urine smell in Mother's house and the need to clean same. Ms. Fries explained that Mother felt that Ms. Fries had bullied or picked on Mother, and Mother's "focus would shift from prioritizing what [she] need[ed] to do to get [the Children] back to 'someone's being mean to me, and I'm going to express that.'"

Such explosive and reactive behavior is indicative of a person who suffers from disruptive mood dysregulation disorder. According to Mr. Beyer, "a disruptive mood is . . . [when] an event occurs and a person over responds emotionally." A person with disruptive mood dysregulation disorder may have difficulty regulating their moods based upon situational and contextual events. "They [might] get too excited, too angry, or . . . frustrated based upon those events." Said behavior is also indicative of someone who suffers from an adjustment disorder. Due to this disorder, Mother "may have difficulty coping with stressors and things that [are] occurring in her life." Mother exhibited behaviors related to both her disruptive mood dysregulation disorder and her adjustment disorder at her initial evaluation with Mr. Beyer. Mr. Beyer testified that Mother was very angry when she arrived at her appointment because the person who took her to the appointment left. Mr. Beyer wrote in his evaluation that, "[d]uring the course of the interview [Mother] became agitated, broke a pen, was cursing, became angry and then

---

[13] Though there is a five-point difference between the scores, Mr. Beyer testified this deviation was normal.

became tearful and despondent." Mr. Beyer called Ms. Affolter for assistance in calming Mother down, and both Mr. Beyer and Ms. Affolter explained to Mother the importance of participating in the evaluation. Despite these discussions, Mother remained focused on the trivial event of her ride leaving her, and she failed to comprehend the significance of the evaluation and the effect it would have on her ability to resume custody of the Children.

In the initial evaluation, Mr. Beyer also noted that Mother was emotionally unstable despite her denial "of serious symptoms of mood disturbance on various assessment instruments." Mr. Beyer's personality testing found that Mother suffered from "serious levels" of major depression. Accordingly, he diagnosed her with major depression because he observed that she had "[d]aily feelings of dejection, apathy, and pessimism." He also reported that Mother was preoccupied with self-doubts, that she had a recurrent pattern of thoughts of death, and periodic thoughts of suicide.

It is unclear whether Mother understands the extent of her intellectual disability or mood disorders. As an initial matter, Mother is unable to explain why she receives social security disability, believing she receives it because she "can't be around a lot of people, [be]cause [she doesn't] get along with a lot of people."[14] In her first interview with Mr. Beyer, Mother acknowledged that she takes prescription medication for her anger and frustration, but she could not recall the name of the medication. In her second interview, when Mr. Beyer asked if Mother had ever been diagnosed with a mental health disorder, she stated, "[n]ot that I know of." However, after Mr. Beyer's follow-up question concerning whether Mother had ever been prescribed medication for a mental health disorder, she responded: "No, well Carey Counseling prescribed me medicine for depression. . . . I don't remember the pills." Though she stated that she took her medication daily, Mother could not recall the name of said medication. At trial, Mother testified that she takes medication for depression and for nightmares, but she could not remember the name of either. Mother was able to recall that she takes Trazodone for sleep.[15]

Clearly, Mother suffers from a mental impairment. Thus, the question becomes whether Mother's impairment adversely affects her ability to parent. We conclude that it does. As the trial court found, Mr. Beyer acknowledged in Mother's follow-up evaluation that, even after one year of supportive services, Mother is not "capable of [the] mature and rational decision-making required to provide for the day to day care of her children." As discussed at length, *supra*, Mother lacks the ability to provide for her own basic needs, let alone the needs of three children. Further, her mental impairment prevents her from making appropriate decisions for herself and the Children. For example, Mother still struggles to use good judgment to identify safe and supportive relationships. Despite discussions with her providers concerning Mother's safety and well-being, she continues

---

[14] It remains unclear from the record why Mother receives social security disability benefits.

[15] Trazodone is a medication often used to treat depression. *Trazodone HCL*, WEBMD.COM, https://www.webmd.com/drugs/2/drug-11188/trazodone-oral/details (last visited December 16, 2020).

to engage in short-term romantic relationships with men she just met. While Mother admits that it would be inappropriate for the Children to be around many of these men, she nevertheless relies on them for support.

Mother's mental impairment also affects her ability to maintain employment and to make good, stable financial decisions. Despite working with multiple service providers on this issue, Mother cannot manage her finances. From the testimony of Ms. Affolter and Ms. Fries, it appears Mother is unable to, (1) prioritize how she spends her money, and (2) learn from past financial mistakes. For example, the record demonstrates that, rather than provide for her own basic needs, Mother continually spends money on her pets. At trial, Mother testified that she would not rehome her animals because they are "like children" to her. What Mother fails to recognize and appreciate is that spending much of her limited income on her pets contributes to her inability to resume custody of her children.

Additionally, Mother's mental impairment affects her ability to care for the Children's physical needs. As Mr. Beyer observed in his follow-up evaluation, Mother did "not appear to be capable of meeting the [C]hildren's physical needs" because she failed to demonstrate "competency of skills taught her, [instead] requir[ing] prompting from others and guidance to initiate nurturing of the [C]hildren." Ms. Affolter's testimony that, during supervised visits with the Children, she often had to prompt Mother to engage with the Children in a safe and appropriate manner, substantiates Mr. Beyer's observation.

Finally, Mother's own testimony exemplifies that she is simply unable to comprehend the type of support and stability the Children require. When asked at trial if Mother understood that "Amber was concerned about [Mother]'s ability to provide for [the Children]," Mother answered: "I always buy for them when they're with me . . . I know I [provide for them]. I make sure they have their food and everything that they need." In Mother's mind, she has always provided for the Children, despite experiencing periods of homelessness where the family was without food or shelter. Indeed, at the time of trial, despite living in the home of a man she barely knows, despite running out of money mid-month, despite having no savings, and despite living in a home that smelled of animal urine, Mother testified that she had established a suitable home for the Children.

Unfortunately, it appears that Mother's mental condition is likely to remain impaired such that it is unlikely she will ever be able to resume care of and responsibility for the Children. Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). In his second evaluation, Mr. Beyer explained that the minimum goals Mother should reach to be able to safely parent the Children were, in part, to "be able to be self-supportive or be willing to accept the need for support from family members to assist her and be able to reside with them without undue conflict."[16] Mr. Beyer noted that Mother's prognosis for functioning independently

---

[16] As discussed, *supra*, because of Mother's tumultuous relationship with her family, DCS encouraged Mother to look to friends for support.

remained poor. He explained that "[h]er intellectual functioning has remained consistently impaired and there is little indication that this will change given more time." Unfortunately, perhaps due to her mood disorders, Mother has been unable to enlist appropriate sources of support for both herself and the Children. As a result, it is unlikely Mother will ever be able to resume care of the Children.

The confluence of Mother's intellectual disability and mood disorders prevents her from being able to achieve the stability necessary to properly and safely parent the Children. While Mother's intellectual disability precludes her from living independently, supporting herself, and trusting others, Mother's mood disorders preclude her from responding appropriately when confused, frustrated, or faced with stressful situations. As a result, as seen throughout this case, Mother is unable to find the support, and often rejects the help, she most desperately needs. While Mother's failure to provide the Children with proper care and supervision is likely not willful, willfulness need not be shown under this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C). Rather, because "[t]he statute serves to protect children from harm caused by a parent who is incapable of safely caring for them," our question is "whether the children would be able to safely live with the parent[]." *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *9 (Tenn. Ct. App. May 14, 2018), *perm. app. denied* (Aug. 13, 2018) (internal citations omitted). We conclude that it would be detrimental to the safety and welfare of the Children to be placed with Mother. There is clear and convincing evidence that Mother's intellectual disability as well as her mood disorders prevent her from safely caring for herself or the Children. Further, we conclude that there is clear and convincing evidence that Mother will likely suffer from her disability and mood disorders for the rest of her life, preventing her from ever resuming care of the Children. In *Department of Children's Services v. Mims*, we concluded that termination of a father's parental rights was appropriate under a similar scenario where a father was "unable to maintain regular employment, unable to support his children, and unable to obtain a home suitable for the family." *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008); *see also In re Katrina S.*, 2020 WL 5269236, at *10 (terminating a mother's parental rights where the mother required a conservator to manage her finances, and where the mother admitted that she could not follow the directions of nurses or doctors and required another adult to attend doctor's appointments with her). Accordingly, we conclude there is clear and convincing evidence to support the trial court's termination of Mother's parental rights as to the ground of mental incompetence.

### E. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the children's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 809).

As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in

the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . .

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

In its order terminating Mother's parental rights, the trial court specifically considered each of the foregoing statutory factors and found that each weighed against Mother. Specifically, the trial court found:

(1) [Mother has] not made any adjustment of circumstance[,] conduct[,] or conditions to make it safe and in the [Children's] best interest to be in [her home].

- 26 -

(2) [Mother has] failed to effect any adjustment after reasonable efforts by [DCS] for almost 2 years. A lasting adjustment does not reasonably appear possible.

(3) Mother has maintained regular visitation with at least two of the Children and, although the Children love her, they do not want to live with her.

(4) A meaningful relationship has not otherwise been established.

(5) A change of caregivers and physical environment would likely have a detrimental emotional, psychological and medical [effect] on the Children.

(6) No one lives with Mother. . . .

(7) The physical environment of [M]other's home is not healthy or safe because of [M]other's inability to make logical and rational decisions concerning the Children. There is no proof of controlled substances or alcohol in Mother's home.

(8) Mother's mental and/or emotional status would be detrimental and, possibly dangerous, to the Children and would prevent [her] from effectively providing safe and stable care and supervision [of] the Children.

(9) [Mother] [has not] paid any child support.

For many of the reasons discussed above, the record supports the trial court's finding that termination of Mother's parental rights is in the Children's best interests. Despite noteworthy assistance from DCS, Mother has failed to remedy any of the conditions that led to the Children's removal. Mother does not have a permanent residence for the Children to return to, and her intellectual disability, in connection with her mood disorders, prevent her from being able to provide a safe and stable environment for the Children. While the record demonstrates that Mother loves the Children and maintained her visits with them, it is clear that she is unable to be the stable and supportive parent the Children deserve.

Indeed, it is clear from the record that the Children already suffer from mental health issues of their own as a result of Mother's care. Laura Tony, Amber's therapist, diagnosed Amber with post-traumatic stress disorder, the underlying trauma being abuse/neglect from Mother.[17] While Amber has completed her trauma-focused therapy, she is still undergoing

---

[17] Aside from the evidence in the record that the Children were often homeless and without food, disturbingly, Amber also reported to Ms. Tony that there was at least one occasion where Mother had sex while the child was in the room. Amber also suffered trauma from watching Mother fight with others and

cognitive behavioral therapy, where she is making "wonderful progress." Amber has expressed to Ms. Tony, her gratitude that she "no longer has to worry about if she will be able to get to school on time or to have food or clothes to wear or where she will sleep at night." Amber has further expressed that, while she loves Mother, and wants Mother to be happy, she does not want to live with Mother because she is afraid Mother will become angry with her. Despite being removed from Mother's custody, it appears Amber continues to fear Mother. Ms. Tony testified that Amber exhibited minor behavioral issues surrounding her visits or telephone calls with Mother, and Amber did not want to participate in same. Similarly, Desiree M., the Children's foster mother at the time of trial, testified that Amber had nightmares the nights before or had small behavioral issues at school the day of or day before she visited Mother. The foregoing substantiates Ms. Tony's testimony that it would be detrimental to Amber's health and well-being to be returned to Mother's care. The record shows that Amber is not the only child who exhibited behavioral issues prior to visiting with Mother. According to Ms. M., Ashley cried for considerable portions of the day before her scheduled visits with Mother and would also cry the day before a scheduled telephone call with Mother.

As discussed at length, *supra*, Mother is unable to provide the Children with a safe and stable environment. Contrastingly, the record shows that the Children are in a safe and stable pre-adoptive home, and that Amber is making positive progress with her mental health treatment.[18] Placing the Children in Mother's care would almost certainly have a detrimental effect on the Children's physical, emotional, and psychological well-being. For these reasons, we conclude there is clear and convincing evidence that termination of Mother's parental rights is in the Children's best interests.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant's parental rights to the Children. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Latoya R. Because Latoya R. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

         s/ Kenny Armstrong
         KENNY ARMSTRONG, JUDGE

---

from watching the police take Mother away.

[18] We note that the Children have changed residences since trial. According to the GAL at oral argument, all three Children currently reside together in a new pre-adoptive home.